**Larry GOOD, et al., Plaintiffs,**

v.

**Richard H. AUSTIN, Secretary of State, Defendant.**

**George Arthur VAN STRATEN, et al., Plaintiffs,**

v.

**Richard H. AUSTIN, Secretary of State, Defendant.**

No. 91–CV–74754DT.

United States District Court, E. and W.D. Michigan.

April 6, 1992.

Theodore Sachs, Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, Detroit, Mich., for Good plaintiffs.

Peter H. Ellsworth, Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, Mich., for Van Straten plaintiffs.

Gary P. Gordon, Asst. Atty. Gen., Lansing, Mich., for defendant Richard H. Austin.

John D. Pirich, Honigman Miller Schwartz & Cohn, Lansing, Mich., for intervenor Representative Dennis M. Hertel.

William J. Perrone, Dykema Gossett, Lansing, Mich., for intervenor Representative Bob Carr.

George Brookover, East Lansing, Mich., for intervenor Senator Carl Levin.

Before RYAN, Circuit Judge, and NEWBLATT and ROBERT HOLMES BELL, District Judges.

## OPINION

The plaintiffs in this consolidated action have challenged Michigan's existing congressional district plan as unconstitutional under Article I, Section 2 of the United States Constitution and have proposed their own redistricting plans to remedy this situation. This three-judge court has jurisdiction over this dispute under 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 28 U.S.C. § 2284(a).

Because the Michigan Legislature, whose duty it is to adopt a redistricting plan for Michigan's congressional districts according to federal constitutional requirements, has failed to do so, this court must.

This is the first of two opinions the court will render in the disposition of this matter. In this opinion, we hold that Michigan's current congressional district plan is unconstitutional. We further conclude that the redistricting plans proposed by the two groups of plaintiffs are unsatisfactory, and we therefore decline to adopt either of them. Instead, we are prepared to adopt a congressional redistricting plan of our own design.

### I.

The principal parties in this case are two groups of plaintiffs, one group representing the interests of the Republican Party (the Van Straten plaintiffs) and the other representing the interests of the Democrat-

ic Party (the Good plaintiffs). In addition, three members of Michigan's current congressional delegation have intervened as plaintiffs—namely, Congressmen Bob Carr, Dennis Hertel, and Sander Levin. The defendant in the action is Richard H. Austin, the Secretary of State of the State of Michigan. The Secretary of State is a nominal defendant, however, and the real adversaries are the two groups of plaintiffs and the intervenors. The Secretary of State remains a proper party, however, because the plaintiffs seek an injunction to enjoin the Secretary from conducting the upcoming 1992 congressional elections under the current apportionment of congressional districts. The Secretary has made no attempt to defend the constitutionality of the current congressional districting and has not taken an active role in this litigation since the pleading stage.

Plaintiffs Larry Good, Carolyn Dulai, Alice Bell McGary, William Blick, Sandra Matthews–Barnes, and James McEwan (the Good plaintiffs) filed their complaint in the United States District Court for the Eastern District of Michigan in July of 1991. They sought a declaratory judgment that Michigan's current congressional district plan is unconstitutional, prayed for injunctive relief, and requested the convening of a three-judge court under 28 U.S.C. § 2284(a). Within a matter of days, plaintiffs George Arthur Van Straten, Frank E. Smith, John W. Hofer, Donna Unger, and Valerie L. Sterzik (the Van Straten plaintiffs) filed a separate action in the United States District Court for the Western District of Michigan, seeking essentially identical relief. In an order issued on August 30, 1991, the Chief Judge of the United States Court of Appeals for the Sixth Circuit convened this three-judge court under 28 U.S.C. § 2284(b). This court then consolidated the two actions.

No party disputes that the current congressional districting in Michigan violates Article I, Section 2 of the United States Constitution and that the number of congressional districts in this state must be reduced from 18 to 16. The court agrees.[1]

In an early pretrial order, the court directed each group of plaintiffs to submit one congressional redistricting plan for the court's consideration. The parties timely filed their respective plans, conducted discovery, and submitted prehearing briefs. In the meantime, the court granted motions to intervene filed by Congressmen Carr, Hertel, and Levin and denied a motion to intervene filed by State Senator David Honigman. The court limited the scope of the intervenors' participation to commenting upon and offering suggestions for modification of the submitted plans. Intervenors were not permitted to file plans of their own.

Evidentiary hearings began on March 9, 1992. During five days of hearings, the court heard the testimony of two congressmen, the drafters of the parties' respective plans, and various expert and nonexpert witnesses. In addition, the deposition testimony of Congressmen Carr and Hertel was received. The case is now under consideration and the court faces the task of ordering appropriate equitable relief.

## II.

The parties have stipulated and we find:

1. Michigan's current congressional districting is unconstitutional under the "one person, one vote" principal enunciated by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–530, 11 L.Ed.2d 481 (1964), and *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969), and a remedy by this court is therefore warranted;

2. The proposed reapportionment plans submitted by the parties satisfy the requirements of the Voting Rights Act, 42 U.S.C. § 1973;

3. A 1992 redistricting plan requires 16 districts, the population of each of which must be 580,956 persons (except for 580,957 persons in one district).

---

1. The reasons for this conclusion and the court's rationale in adopting a plan of its own design will be discussed in the court's final opinion and judgment.

### III.

The Good plaintiffs and the Van Straten plaintiffs have each proposed a single redistricting plan for the court's consideration. In addition, the intervenors have commented on both of these plans and have recommended specific modifications with respect to the Van Straten plaintiffs' plan.

There is, of course, no requirement that the court adopt either of the submitted plans. If we find that both of these plans either fail to satisfy the mandatory constitutional and statutory criteria or fail to balance properly the appropriate secondary or equitable criteria, we are free to, and indeed must, adopt a plan of our own. We begin, however, with an analysis of the submitted plans.

■ Any plan that is adopted must satisfy three different levels of criteria. The first and foremost criterion is the constitutional requirement of precise mathematical equality of population, to the extent mathematically possible, in each district. *Karcher v. Daggett*, 462 U.S. 725, 732, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983). Second, the plan must comply with the requirements of Section 2 of the Voting Rights Act. 42 U.S.C. § 1973. Finally, the plan must properly balance a wide array of secondary or equitable criteria. Federal courts have recognized the following as relevant secondary criteria: compactness, contiguity, preservation of the integrity of county and municipal boundaries, maintenance of the cores of existing districts, preservation of cultural, social, and economic communities of interests, and political and racial fairness. *See, e.g., Agerstrand v. Austin*, No. 81–40256, slip op. at 7–8 (E.D.Mich. May 20, 1982); *O'Sullivan v. Brier*, 540 F.Supp. 1200, 1203 (D.Kan. 1982).

We conclude that the plans submitted by both parties satisfy the constitutional requirement of population equality. Both plans also comply with the mandates of Section 2 of the Voting Rights Act. 42 U.S.C. § 1973.

Because the submitted plans satisfy the mandatory constitutional and statutory criteria, we must evaluate them for the proper balancing of the secondary criteria we have identified. To repeat, the secondary criteria are: 1) contiguity, 2) compactness, 3) retention of the geographic and population cores of existing districts, 4) preservation of the integrity of county and municipal boundaries, 5) maintenance of cultural, social, and economic communities of interests, 6) political fairness, and 7) racial fairness. Although the parties acknowledge the validity of all of these criteria, it became abundantly clear at the evidentiary hearings that they regard the criterion of political fairness as most important. It also quickly became evident at the hearings that the parties have very different notions of political fairness. Both sets of plaintiffs called an expert witness to testify concerning the fairness of the respective plans. Not surprisingly, the Good plaintiffs' expert extolled the political fairness of the Good plan and denigrated the Van Straten plaintiffs' plan, while the Van Straten plaintiffs' expert reached exactly the opposite conclusions.

The basis for the experts' disagreement over the political fairness of the proposed plans stemmed from their difference of opinion concerning the meaning of the concept of political fairness and the most appropriate method for measuring a plan's achievement of political fairness.

The Good plaintiffs' expert, Dr. Allan Lichtman, criticized the Van Straten plan on a number of grounds, which he characterized as classic methods of gerrymandering. He noted first that the Van Straten plan pits two pairs of Democratic incumbents against each other, thus assuring the loss of two Democratic incumbents. The Good plaintiffs' plan, on the other hand, pits one pair of Republicans and one pair of Democrats against each other, thus sharing the loss of the two seats equally between the parties. Dr. Lichtman concluded that one of the reasons the Van Straten plan is politically unfair is because it pairs incumbent congressmen in the current 14th and 17th districts and in the 7th and 8th districts.

The Van Straten plan is also unfair, according to Dr. Lichtman, in its treatment of

the Democratic incumbents from the current 3rd, 6th, and 12th congressional districts. He noted that the Van Straten plan significantly erodes the present population bases of those districts, while at the same time altering their underlying partisan structure in a way that favors Republicans. He found no similar treatment of Republican incumbents in the Good plan and concluded that the Good plan is more politically fair as a result.

Finally, Dr. Lichtman noted that the Van Straten plan unnecessarily "packs" Democratic-leaning voters into certain districts and fragments other concentrations of Democratic-leaning voters into multiple districts, with the effect of diluting Democratic voting strength. These techniques, he concluded, result in a plan that will give the Republicans an unfair advantage in upcoming elections. Again, he noted that the Good plaintiffs' plan does not involve similar packing and fragmentation of Republican-leaning voters.

Dr. Lichtman reached his conclusions on the basis of an extensive statistical analysis of the underlying partisan preferences of Michigan voters. In general, both parties agree that Michigan voters are roughly evenly split between those favoring Republicans and those favoring Democrats. To determine whether a redistricting plan has unfairly packed or fragmented partisan support, therefore, the geographic location of these voters must be identified. Dr. Lichtman examined the results of a partisan statewide election not involving any high profile "glamour" candidates and largely devoid of specific issues, and used it as a base line to evaluate the partisan makeup of each district of the parties' proposed plans. In Dr. Lichtman's opinion, the most ideal election in Michigan for this purpose is the one for the State Board of Education. He explained that the best way to determine the basic partisan preferences of voters is to examine the results of a "bottom-of-the-ticket" race, such as the Board of Education race, because such races are the least likely to be affected by particular issues and individual characteristics of the candidates. He testified that his analysis of several previous Board of Edu-

cation election results demonstrated that the Van Straten plan had unnecessarily packed and fragmented Democratic voters in a number of districts. The same analysis revealed no such packing and fragmentation in the Good plan. As a result, he concluded that the Good plan is the fairer of the two.

The Van Straten plaintiffs' expert, Dr. Gary King, applied a different analysis to the plans and predictably reached quite different conclusions. In contrast to the methodology of the Good plaintiffs' expert, Dr. King was less concerned with the general partisan leanings of the populace as measured by noncongressional elections and more concerned with their historical preferences in congressional elections. Based primarily on these preferences and secondarily on a host of other factors, Dr. King evaluated the two plans for political fairness under two tests he described as the "proportionality" test and the "partisan symmetry" test.

The proportionality test is actually a test for symmetry in certain narrow circumstances. It tests a redistricting plan to determine whether it is likely to produce, statewide, a congressional delegation that is proportional in its partisan makeup to the overall partisan makeup of the state. Noting that perfect proportionality is quite unusual, Dr. King expressed a preference for the universally applicable "partisan symmetry" test. Under this test, a districting plan is evaluated to determine whether it will allow each party to translate the same percentage of overall votes into the same number of congressional seats. If both parties can translate votes into seats in the same proportion, the plan achieves partisan symmetry and is politically fair. For example, if under a proposed plan one party could win 75% of the seats with 55% of the popular vote, the plan would be fair only if the other party could also win 75% of the seats with 55% of the popular vote. Applying this analysis to both the Van Straten and the Good plans, Dr. King concluded that the Good plan is biased in favor of the Democrats and there-

fore politically unfair, while the Van Straten plan is not biased and therefore is fair.

We conclude that the testimony of these experts, as well as the other evidence in the case, has established that both proposed plans were designed to advantage the political parties on whose behalf they were drafted and submitted. It is clear that a redistricting plan can be drawn in any number of imaginative ways to achieve political advantage and yet satisfy any given test of political fairness. The parties' own experts have convinced us that a given plan may appear to be fair under a particular test and in reality be a gross gerrymander. That both parties have found eminently qualified experts to extoll the political fairness of their own plan as compared to that of their opponent suggests to us that their elevation of this criterion above all others is, in the last analysis, an attempt to obtain partisan advantage under the guise of achieving political fairness.

▬ After careful consideration of the testimony of the parties' experts, the non-experts who drew the submitted plans, the intervening congressmen, and an evaluation of the voluminous statistical data in evidence, we find that both plans are excessively partisan. They are manifestly designed to advantage their partisan proponents in the next and in ensuing congressional elections. Both plans, to some degree, gerrymander district lines not only to achieve partisan advantage but, in a number of instances, to accommodate and advantage incumbent congressmen. While these purposes are not of themselves illegal or necessarily inequitable, they prove to be unacceptable in the plans before us because the resultant partisan and incumbent advantages are achieved at the unnecessary and inequitable expense of sacrificing geographical compactness and fragmenting an excessive number of counties, cities, and townships among two or more congressional districts. We believe that geographical compactness and preservation of the integrity of county, city, and township lines, to the extent reasonably possible, are paramount secondary criteria and serve important nonpartisan interests of the citizens of the State of Michigan. The submitted plans unnecessarily and unfairly sacrifice those interests in order to achieve excessive and inappropriate political advantage. Consequently, we decline to adopt either the Van Straten plaintiffs' plan or the Good plaintiffs' plan.

We understand that our duty as a court of equity requires us to adopt a plan that conforms with the constitutional and statutory criteria and properly balances the relevant secondary criteria we have identified, free of inappropriate, partisan and incumbent bias.

Because the plans submitted by the parties do not meet those standards, we have designed and are prepared to adopt a plan of our own. The plan, including maps and relevant supporting data, is attached to the order accompanying this opinion. It reflects a new beginning in the configuration of Michigan congressional districts because of the necessity to reduce the number of districts from 18 to 16 and to increase and equalize their ideal population. We have changed the numbers of the districts in our plan to reflect a more logical relationship between the location of the districts and their numbers. The current district numbering is the anachronistic residue of several decades of decennial reconfiguration and changes in the number of districts. Consequently, the current numbering no longer makes sense.

Before entering a final order adopting this plan, we shall require the parties to show cause, in writing, not later than 5:00 p.m., April 1, 1992, why the court's plan should not be incorporated in a final judgment.