James R. KING, Plaintiff,

v.

STATE BOARD OF ELECTIONS, David
E. Murray, Lawrence E. Johnson,
Hannelore Huisman, Judith Jones,
Langdon D. Neal, Theresa M. Petrone,
Wanda Rednour, Defendants,

and

Bobby Rush, Timuel Black, Al Johnson,
Elvira Carrizales, Neomi Hernandez,
and the Chicago Urban League, and the
United States of America, Defendant–
Intervenors.

No. 95 C 827.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 5, 1997.

Douglas Edward Markham, Houston, TX,
for Plaintiff.

Joan Cagen Laser, United States Atty's Office, Chicago, IL, Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL, Maria Valdez, Mexican Amer.Legal Defense & Educ. Fund, Chicago, IL, Clyde Murphy, Chicago Lawyers' Committee for Civil Rights, Chicago, IL, Martha J. Avery, Robins, Kaplan, Miller & Ciresi, Chicago, IL, Brenda Wright, Lawyers' Committee for Civil Rights, Washington, DC, Mark Stephen Grotefeld, Provizer, Phillips, Grotefeld & Denenberg, P.C., Charles Frank Marino, David M. Marino, Chicago, IL, for Intervenors.

Limo T. Cherian, Mitchell Bruce Katten, O'Rourke & Griffin, Chicago, IL, for Defendants.

Before KANNE, Circuit Judge, and NORGLE, District Judge and COAR, District Judge.

## MEMORANDUM OPINION AND ORDER

This matter is before the court on remand from the Supreme Court for further consideration in light of *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (hereinafter *"Shaw II"*), and *Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (hereinafter *"Bush"*). *King v. Illinois Bd. of Elections*, — U.S. —, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996). Pursuant to 28 U.S.C. § 2284(a), the undersigned three-judge panel was appointed to preside over this litigation.

Upon remand, plaintiff filed a motion for an additional evidentiary hearing. This court denied the requested relief by order of April 4, 1997. Plaintiff has since moved this court to reconsider its ruling on that issue. Briefs have been filed both on the remand and on plaintiff's motion for an additional evidentiary hearing. Thus, this case is before the court on both issues. Having carefully examined *Shaw II* and *Bush* and the memoranda and arguments presented by the parties, this court finds both cases supportive of its analysis and accordingly affirms its previous decision in *King v. State Bd. of Elections*, No. 95–C827, 1996 WL 913660, — F.Supp. —— (N.D.Ill. Mar. 6, 1996) (hereinafter *"King I"*). Moreover, for the reasons stated in this memorandum opinion, plaintiff's motion to reconsider is denied.

It is important to note at the outset, however, that this opinion merely supplements the subject of the remand and its purpose is to determine what impact, if any, *Shaw II* and *Bush* have on this court's prior analyses. Hopefully, this opinion will provide a roadmap of *King I* that illustrates that *King I* is in accord with *Shaw II* and *Bush*. To this end, this opinion will discuss the relevant holdings of each of those opinions.

### Discussion

Since this court issued its ruling in *King I*, the Supreme Court has further developed its constitutional jurisprudence with respect to voting rights in two pivotal decisions: *Shaw II* and *Bush*. These decisions of even date have markedly changed and elucidated the landscape of voting rights litigation and legislation. As a result, this court has undertaken a full review of the underlying record as well as the briefs filed upon this remand. The court has likewise carefully considered the evidence submitted upon the plaintiff's offer of proof in support of his motion to reopen the evidence.[1] Nothing in this restudy of the

---

1. Plaintiff proposed to present the court with the following:
    (a) Names and addresses of voters who lost their ballot secrecy in specific precincts in Chicago and Cook County; for example, two voters residing in the 400 block of Noble St. in the 1st Ward, precinct 55 in the March 19, 1996 primary were the only two of 139 Democrats in the precinct who were placed in Congressional District 7 instead of Congressional District 4; currently Plaintiff has a total of thirty (30) such instances occurring in 1996, 1994 and 1992 General Congressional Elections and the 1992 Primary Congressional Election.
    (b) Administrative confusion; for example, that occurring in Proviso precinct 132, in the western section of North Riverside, where voters on the 9000 block of Forest View Drive have been incorrectly assigned to Congressional District 4 for the last (3) election cycles.
    (c) Fractured neighborhoods, including the testimony of Dr. John Pelissaro, an expert witness in the *Barnett* case, regarding the continued reliance by the City and other governmental bodies upon maps of the community areas and neighborhoods of the City of Chicago.

record has revealed any error in the statement of facts set forth in *King I*. Rather, the court remains of the view that the facts, other than those to be inferred, are correctly set forth in its prior opinion.

Notwithstanding the accuracy of the factual record, certain comments upon the law are in order. Indeed, the necessity for or the propriety of reopening the record can better be judged following some analysis of both the legal and factual issues involved in this remand. Moreover, such analysis affirms this court's earlier conclusion that the Fourth Congressional District (hereinafter the "Fourth District") is constitutionally sound.

## I. The Import of *Shaw II* and *Bush* to *King I*

*Shaw II* and *Bush* have a direct impact on this court's strict scrutiny analysis in *King I*. Although both *Shaw II* and *Bush* further develop the analysis that should apply to each aspect of voting rights litigation, (*e.g.,* the *Gingles* test and the "predominance of race" test—especially, with respect to § 2 violations), none of these developments alters this court's determination that strict scrutiny applies. Rather, on remand, what is implicated by the two more recent decisions is this court's strict scrutiny analysis, and more specifically, the issue of whether the Fourth Congressional District is a narrowly tailored response to prior discrimination. In *King I*, this court set forth a strict scrutiny analysis which supported its conclusion that the Fourth District is constitutional. A review of that analysis in light of *Shaw II* and *Bush* reveals that no additional examination is required.

### A. Compelling State Interest

■ In addition to finding that there is no dispute that race was a factor in the configu-

ration of the Fourth District, this court concluded that "racial considerations predominated." *King I*, 979 F.Supp. at 606, 610. Accordingly, this court applied strict scrutiny to the Fourth District to determine whether it passed constitutional muster under the Equal Protection Clause.

In order to survive strict scrutiny, the Fourth District must be proved narrowly tailored to serve a compelling state interest. The compelling state interest proffered by the *Hastert* court was remedying a potential violation of or achieving compliance with § 2 of the Voting Rights Act. *Id.* at 610. Recognizing that the Court has never expressly held that remedying a potential violation of or achieving compliance with § 2, standing alone, is a compelling state interest, this court advanced arguments based on earlier Supreme Court decisions on race-based remedies in support of its view that such an interest is compelling. Specifically, this court asserted that the Court's recognition of a distinction between " 'what the [Voting Rights Act] permits and what it requires' " and its resulting conclusion that " 'compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and applications of those laws' " demonstrate that race-based remedies may be appropriate. *King I*, 979 F.Supp. at 582, at 614 (quoting *Shaw v. Reno*, 509 U.S. 630, 653, 113 S.Ct. 2816, 2830, 125 L.Ed.2d 511 (1993); *Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 1156, 122 L.Ed.2d 500 (1993)). Moreover, noting the Court's acknowledgment of justifiable race-based remedies to cure the effects of past discrimination where there is a "strong basis in evidence" of the harm being remedied, this court reasoned that

---

(d) Evidence of the split political subdivisions by Congressional plans in the 1980's and 1970's in contrast to the *Hastert* plan.

(e) While evidence was offered that Hispanic citizens do not comprise a majority of the present 4th Congressional District, Plaintiff is now prepared to offer further evidence of the Citizen Voting Age Population introduced to a sister court in the *Barnett* proceeding. This evidence would include the testimony of Congressman Gutierrez that he

knew in 1991 that Latino voters were not a majority of the district.

(f) Evidence that African–Americans can elect their candidate of choice in far less racial districts than the present 7th Congressional District; this would include data of recent victories by African–American congressmen in districts with less than 50% VAP African–Americans.

Pl. Motion at 3–4.

"[t]his compelling state interest extends to remedying past or present violations of federal statutes intended to eliminate discrimination in specific aspects of life." *Id.* (citing *Quilter v. Voinovich,* 912 F.Supp. 1006, 1020 (N.D.Ohio 1995) (citations omitted); *Shaw v. Hunt,* 861 F.Supp. 408, 437 (E.D.N.C.1994)).

In *Bush,* Justice O'Connor (in concurrence) provided additional support for these propositions. She asserted that compliance with § 2 of the Voting Rights Act and, in particular, the results test, is a compelling interest. In favor of that position she wrote:

> We should allow States to assume the constitutionality of § 2 of the Voting Rights Act, including the 1982 amendments.

This conclusion is bolstered by concerns of respect for the authority of Congress under the Reconstruction Amendments. *See Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1562–1563, 64 L.Ed.2d 119 (1980). The results test of § 2 is an important part of the apparatus chosen by Congress to effectuate this Nation's commitment "to confront its conscience and fulfill the guarantee of the Constitution" with respect to equality in voting. S. Rep. No. 97–417, p. 4 (1982), U.S.Code Cong. & Admin. News 1982, pp. 177, 181. Congress considered the test "necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights." *Id.,* at 27, U.S.Code Cong. & Admin. News 1982, p. 204. It believed that without the results test, nothing could be done about "overwhelming evidence of unequal access to the electoral system," *id.,* at 26, U.S.Code Cong. & Admin. News 1982, p. 204, or about "voting practices and procedures [that] perpetuate the effects of past purposeful discrimination," *id.,* at 40, U.S.Code Cong. & Admin. News 1982, p. 218. And it founded those beliefs on the sad reality that "there still are some communities in our Nation where racial politics do dominate the electoral process." *Id.,* at 33, U.S.Code Cong. & Admin. News 1982, p. 211. Respect for those legislative conclusions mandates that the § 2 results test be accepted and applied unless and until

current lower court precedent is reversed and it is held unconstitutional.

> In my view, therefore, *the States have a compelling interest in complying with the results test as this Court has interpreted it.*

*Bush,* 517 U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring) (emphasis added). Similarly, in a lengthy dissent in which Justices Ginsburg and Breyer join, Justice Stevens refers to the Court's assumption that compliance with § 2 of the Voting Rights Act is a compelling state interest as "perfectly obvious ." *Id.* at ——, 116 S.Ct. at 1989 (Stevens, J., dissenting). These comments support this court's conclusion that remedying a potential violation of or achieving compliance with § 2 is a compelling state interest. Indeed, in *King I* this court wrote:

> Because the purpose of Section 2 is "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race [or] color . . .", . . . state actors have frequently argued that a racially based redistricting remedy under Section 2 serves a compelling government interest.

\*    \*    \*

> In *Shaw,* the Court recognized that a significant state interest exists in eradicating the effects of past racial discrimination, provided the State has a "strong basis in evidence for concluding that remedial action [is] necessary." . . . . This compelling state interest extends to remedying past or present violations of federal statutes intended to eliminate discrimination in specific aspects of life.

*King I,* 979 F.Supp. 582, 614 (citations omitted). The *King I* opinion then goes on to acknowledge the strong basis in evidence that the Hastert court had "both for finding a § 2 violation and for adopting a redistricting plan that remedied that violation." *Id.* at \* 27, ——. Thus, in light of the statements of Justices O'Connor and Stevens and the absence of any contrary holding by a majority of the Court, this court affirms its prior analysis that remedying a potential violation of or achieving compliance with § 2 constitutes a compelling state interest.

## B. Narrow Tailoring

The true significance of the Court's remand of *King I* becomes evident upon review of this court's discussion on the narrow tailoring of the Fourth District. In *Shaw II* and *Bush* the Supreme Court defines the parameters of narrow tailoring in an effort to guide lower courts in their evaluation of challenged legislative or judicial action in the voting rights context. Although this court did not perform analyses that expressly reflect the newly articulated narrow tailoring inquiry in *King I*, it drew all of the conclusions necessary to support its holding within that framework.

In *Bush*, Justice O'Connor noted that the narrow tailoring prong permits "a limited degree of leeway" in drawing remedial districts, provided that (1) there exists a "strong basis in evidence" of the three Gingles prerequisites and (2) the race-based district "substantially addresses the § 2 violation." *Id.* at ——–——, 116 S.Ct. at 1960–61. To be sure, *Bush* makes clear that the shape of the district is relevant to the narrow tailoring inquiry. *Id.* at ——, 116 S.Ct. at 1962. However, *Bush* rejected as "impossibly stringent" the view that "a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria." *Id.* Thus, "a § 2 district that is reasonably compact and regular, taking into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts [ ] in endless 'beauty contests' " if it does not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Id.* at ——, 116 S.Ct. at 1961.

■ *Shaw II* further defines this standard in holding that, in order to pass constitutional muster under the Equal Protection Clause, the majority-minority district "must, at a minimum, remedy the anticipated violation or achieve [§ 2] compliance ...". *Id.* at ——, 116 S.Ct. at 1905. Read together, *Shaw II* and *Bush* reveal the following precept for narrow tailoring inquiries under § 2: A § 2 district is narrowly-tailored if (1) at a minimum, the district remedies the anticipated violation or achieves § 2 compliance, and (2) its consideration of race is no more than reasonably necessary to fulfill its remedial purpose.

In concluding that the Fourth District was narrowly tailored, this court deferred to the *Hastert* court's discretion in adopting remedial plans and its "exacting constitutional review" in determining the best remedial measure. *King I*, 979 F.Supp. at 616. In addition, this court found that the Fourth District "was properly proportioned to the nature of the violation." *Id.* Specifically, this court stated,

> [T]he [*Hastert*] court adopted a single majority-minority district which was limited in size to the minimum number of Hispanic residents generally believed necessary to counteract the effects of racial bloc voting and ensure that the Hispanic electorate had a reasonable opportunity to elect a candidate of its choice. It further determined that the district's extraordinary configuration was required to preserve shared communities of interest and protect the three African–American super-majority districts against impermissible retrogression. Under these circumstances, this court defers to the *Hastert* court's balancing of these concerns and concludes that it adopted a narrowly tailored plan.

*Id.*

In order to support this conclusion in the wake of *Shaw II* and *Bush*, the record must demonstrate that (1) there was a "strong basis in evidence" for finding the threshold conditions for § 2 liability; (2) at a minimum, the Fourth District remedies the anticipated violation or achieves § 2 compliance; and (3) the district's consideration of race is no more than reasonably necessary to fulfill its remedial purpose. Having determined that there was a "strong basis in evidence" for finding the threshold conditions for § 2 liability,[2] this court must show that the Fourth District achieves compliance with § 2 or remedies the anticipated violation thereof and does "not subordinate traditional districting principles

---

2. *See King I*, 979 F.Supp. at 615.

to race substantially more than 'reasonably necessary.' "

■ A district cannot be held to remedy a potential § 2 violation if the minority group contained therein is not (1) "geographically compact;" (2) "politically cohesive;" and (3) potentially barred by majority bloc voting from electing its preferred candidate, absent the existence of the district. *See Bush,* 517 U.S. at ——, 116 S.Ct. at 1961; *Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1906. Thus, as part of its narrow tailoring inquiry, this court must rely on its earlier findings that the Fourth District meets these three requirements. These findings are contained in this court's discussion of the *Hastert* Court's § 2 analysis, which this court adopted later in its opinion: [3]

> The [*Hastert*] court made the following findings of fact to support its conclusion that the Chicago/Cook County Hispanic community was "sufficiently large and geographically compact to constitute a single district majority." First, the 1990 census reported the Hispanic population in Chicago at 545,852, a 29.33% increase over the 1980 total. Second, "[m]ost of the Chicago/Cook County Hispanic population is clustered in two dense enclaves, one on Chicago's near northwest side and one on the near southwest side." Third, the two enclaves are less than one mile apart at their closest point. Fourth, this separation resulted from exogenous physical and institutional barriers—specifically, the east-west Eisenhower Expressway, the University of Illinois–Chicago Circle campus, and various major medical institutions—and thus did not indicate the existence of two distinct communities.
>
> To support its conclusion that the Chicago/Cook County Hispanic community was politically cohesive, the court adopted the findings of cohesiveness made by two federal courts in the early 1980s in cases where the Hispanic community challenged discriminatory redistricting practices at the state and local levels. The court further found that the voting bloc patterns of the Hispanic community also demonstrated its political cohesiveness. More specifically, the court found that "[s]ingle and bivariate regression analysis of voting patterns in Chicago precincts demonstrate significant ethnic bloc voting patterns." Finally, the court found that the third threshold factor was fulfilled because the paucity of Hispanic officials in city and state-wide elected political offices compelled "the finding that ethnic bloc voting patterns have thwarted the political interests of the Hispanic community."

*Id.* at 596–97 (citations omitted). In addition to these three factors, the *Hastert* court considered the "totality of the circumstances" test, also required under *Gingles,* to determine whether the Fourth District was warranted under § 2.

> However, rather than making its own findings of fact with respect to these factors, the [*Hastert*] court adopted the Seventh Circuit's findings concerning the Chicago Hispanic community set forth in *Ketchum v. Byrne* [740 F.2d 1398 (7th Cir.1984) ], the Section 2 Voting Rights Act challenge of the 1982 Chicago aldermanic redistricting plan. Based on a "judicially recognized history of discrimination, both past and present, against the Chicago Hispanic community and its attendant impact on effective political participation and representation," the *Hastert* court concluded that an Hispanic majority district was warranted under *Gingles.*

*Id.* at 597 (citations omitted).

These conclusions, in addition to those contained in this court's refutation of several arguments advanced by plaintiff in an effort to challenge the *Hastert* court's findings, are sufficient to establish that the Fourth District is narrowly tailored even in light of *Bush* and *Shaw II.* For example, this court rejected King's argument that the *Hastert* court erred in finding that the Hispanic community was sufficiently numerous by failing to determine the proper eligible minority voting population, that is, the total population

---

**3.** *Id.* at 614 ("The *Hastert* court properly held an Hispanic majority district was warranted under Section 2 of the Voting Rights Act.").

Hispanic citizens of voting age. This court declined to resolve whether the *Hastert* court had an obligation to identify this population before making its finding of numerosity since King did not "establish[ ] via competent evidence that the Hispanic citizen voting age population falls below fifty percent." *Id.* at 612. The court further concluded that "regardless of which measure this court uses— total population, voting age population, or citizen voting age population—the *Hastert* court properly found that the City of Chicago/Cook County community was sufficiently numerous to constitute a majority in a properly drawn district. The congressional election results of 1992 and 1994 serve to confirm this conclusion." *Id.* at 612.

In addition, this court addressed the argument that the Puerto Rican and Mexican-American communities were not politically cohesive because of their allegedly "different cultural, social, political, and economic concerns that serve to separate rather than unify the Latino community." *Id.* Finding that the "lay opinion elicited by King at trial to demonstrate and substantiate the claimed lack of cohesion was mainly anecdotal, often incredible, and wholly insufficient to support the inferences and conclusions King seeks to draw[,]" this court concluded that the *Hastert* court's finding of political cohesiveness was not clearly erroneous. *Id.*

Moreover, this court also resolved that, since 1991 there was no change in circumstances to support a finding that white racial bloc voting had decreased. *Id.* at 613. Rather, this court found that,

> [s]ince 1988, only three Hispanic candidates have been elected in citywide elections. Two Hispanic judges were elected in 1988 and 1990; however, both candidates won with less than a majority of the vote due to a splintering of votes among

multiple white candidates. In addition, Miriam Santos, an Hispanic, was elected as city treasurer in 1991; however, Ms. Santos had been slated for this position by the Chicago Democratic Party and she ran on a slate that included incumbent mayor Richard Daley. Ms. Santos subsequently ran as an incumbent in 1995 and was reelected. With the exception of Ms. Santos, the Democratic Party has not slated an Hispanic candidate for alderman, state senate, state representative, or congress in any district with a white majority voting age population.

*Id.* This court also acknowledged that,

> [w]hile Ms. Santos's electoral success raises hopes for a color-blind slating and election processes [sic] in the future, the problems of racial bloc voting and exclusion of Hispanics from the powerfully important slating process remain. The *Hastert* court thus properly found that the third *Gingles* factor was satisfied in 1991, and King has not established any present day change in circumstances that would warrant a contrary finding.

*Id.*

In its discussion of whether race predominated in the *Hastert* court's configuration of the Fourth District, this court also rejected the argument that its bizarre shape belies compactness. The following is a passage from that discussion:

> To a certain extent, the clustering of Hispanics into two densely populated enclaves provided map makers with the luxury of resorting to traditional districting principles. It is not surprising to find that a comparatively small district with two densely packed minority enclaves is (excluding the connector)[4] more compact

---

4. The evidence at trial demonstrated that only 4.7% of the population of the Fourth District was contained in the connector. *Id.* at 609 & n. 49. Thus, all but a small fraction of the population resides within the compact areas which clearly satisfy the *Gingles* criteria. By contrast, only 20% of the districts challenged in *Shaw II* coincided with the area where the targeted minority group was allegedly geographically concentrated. *Shaw II*, at ——, 116 S.Ct. at 1907. Thus 80% of the district did not contain a compact minority

population. *Id.* Moreover, the western connector serves to preserve the shared interests of Latino voters and protect the three African American majority districts from retrogression. In the absence of evidence that those districts are unconstitutionally drawn, the preservation of existing districts was a valid secondary consideration. *See Good v. Austin*, 800 F.Supp. 551, 554 (E. & W.D.Mich.1992) (emphasis added) ("Federal courts have recognized the following as relevant secondary criteria: compactness, contiguity,

and more respectful of political subdivisions than a larger district drawn to capture a more dispersed minority population.

\* \* \*

In this case, a careful analysis of the Fourth District's boundaries establishes that they were drawn to maximize the percentage of Hispanics located within the district. As King's witness Cleveland testified, the lines of the Fourth Congressional District follow the concentrations of the Hispanic population with "exquisite" detail. The district's boundaries were drawn at the census block level, which roughly corresponds to a city block. While the map makers had to use census block data to ensure population equality, the census block data contained racial data at the city block level. This data permitted the map makers to draw the district's boundaries on a block-by-block basis in order to maximize the concentration of Hispanics within the district. As a result, when a map of the is superimposed over a map showing the concentration of the Hispanic population drawn at the census tract level, the district map "includes virtually all areas of high percent Hispanic concentration on the northern ... part of the City of Chicago as well as virtually all of the areas of high Hispanic concentration on the southern part of the City of Chicago." The same is true when the exercise is repeated at the census block level based upon the percentage of Hispanic concentration, and when Latino plurality block groups are considered. This close correlation is not surprising given the racial demographics of the city discussed earlier.

\* \* \*

preservation of the integrity of county and municipal boundaries, *maintenance of the cores of existing districts*, preservation of cultural, social, and economic communities of interest and political and racial fairness."); *see also White v. Weiser,* 412 U.S. 783, 793–97, 93 S.Ct. 2348, 2353–56, 37 L.Ed.2d 335 (1973) (establishing incumbency protection as a legitimate districting principle). Thus, the western connector, while it contributes to the district's physical inelegance, does not compel a finding that traditional districting factors were subordinate to race more than reasonably necessary in the configuration of the Fourth District.

The evidence also establishes that the boundaries of the Fourth Congressional District split a number of political subdivisions, including: eight (8) townships—six (6) of which have population in the district; eighteen (18) municipalities—sixteen (16) of which had population in the district; twenty (20) aldermanic wards; and two-hundred eighteen (218) precincts. With the exception of precincts, other Illinois congressional districts split a comparable or greater number of subdivisions compared to the Fourth District: the Third, Sixth and Eleventh Districts split a similar number of townships (9, 8 and 7, respectively); the Second, Third, Sixth, Eighth, Eleventh and Thirteenth Districts all split more municipalities; and the First and Seventh Districts split a comparable number of aldermanic wards (19 and 15, respectively).[5]

*Id.* at 608–10 (footnotes and citations omitted).

Finally, the *King I* opinion presented evidence that the Fourth District, in fact, remedied the anticipated § 2 violation by preserving the Latino community's voting strength through vote consolidation. In this light, this court wrote:

[T]he redistricting plan adopted by the *Hastert* court has served more than a remedial role: hindsight reveals that it has protected the Hispanic community since 1991 from the invidious effects of racial bloc voting that, regrettably, retains its chokehold on the Chicago electorate. Accordingly, this court concludes that the

5. Although this court resolved that this evidence, when applying the "predominance of race" test, "is of extremely limited usefulness because there is no meaningful standard against which it is to be measured[,]" it also held that the data permit "the uncertain conclusion that compared to other Illinois congressional districts, the map of the Fourth Congressional District did not excessively split political subdivisions." *Id.* While uncertain, this conclusion offers support that the Fourth District is "reasonably compact" when viewed in comparison to other Illinois congressional districts and therefore should not be disregarded.

remedy adopted by the *Hastert* court to redress an established Section 2 violation served, and continues to serve, compelling state interests.

*Id.* at 615.

In light of the foregoing, this court concludes that, under both *Shaw II* and *Bush*, the Fourth District remedies the anticipated violation and achieves § 2 compliance, and that its consideration of race (reflected by its noncompactness and irregularity) is no more than reasonably necessary to fulfill its remedial purpose. Accordingly, the ruling in *King I* need not be amended or altered in view of either case.[6] Rather, these decisions affirm this court's original conclusion that the Fourth District passes constitutional muster.

## II. The Usefulness of an Additional Evidentiary Hearing

As is apparent from the above discussion, the pertinent factual data needed to determine the constitutionality of the Fourth District was before this court upon its initial adjudication of this matter. Neither *Shaw II* nor *Bush* introduces legal guidelines that require additional findings of fact by this court. There is therefore no need to reopen the record and conduct an additional evidentiary hearing. Accordingly, plaintiff's motion to reconsider this court's earlier ruling denying an additional evidentiary hearing in this matter is denied.

### *Conclusion*

For the foregoing reasons, this court affirms its earlier ruling that the Fourth District passes constitutional muster and denies plaintiff's motion to reconsider this court's

oral ruling denying plaintiff's motion for an additional evidentiary hearing.

---

6. Since *King I* was remanded, plaintiff's counsel has directed this court's attention to certain recent decisions of the Court, *e .g., Lawyer v. Department of Justice,* —— U.S. ——, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997) (affirming district court's decision upholding constitutionality of voting district based on low income); *Meadows v. Moon,* —— U.S. ——, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997) (summarily affirming district court's invalidation of Virginia's third congressional district for lack of narrow tailoring). After reviewing these decisions, this court finds that none of the cited cases affects the determinations or conclusions stated herein.