**IT IS SO RECOMMENDED AND CERTIFIED,** this the 14th day of January 2014.

GEORGIA STATE CONFERENCE OF the NAACP, et al., Plaintiffs,

v.

FAYETTE COUNTY BOARD OF COMMISSIONERS, et al., Defendants.

Civil Action No. 3:11–cv–123–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Feb. 18, 2014.

Leah C. Aden, Natasha Korgaonkar, Ryan P. Haygood, NAACP Legal Defense and Education Fund, Inc., New York, NY, Neil T. Bradley, Law Office of Neil Bradley, Avondale Estates, GA, for Plaintiffs.

Anne Ware Lewis, Bryan P. Tyson, Frank B. Strickland, Strickland Brockington Lewis, LLP, Atlanta, GA, Phillip L. Hartley, Harben, Hartley & Hawkins, LLP, Gainesville, GA, for Defendants.

## *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

█ Judicial redistricting is not ideal. So where legislative action can remedy an unconstitutional or unlawful election plan, redistricting should be left to elected officials. *Perry v. Perez,* —— U.S. ——, 132 S.Ct. 934, 941, 181 L.Ed.2d 900 (2012). Yet this rule is not without exception, such as when the timing of an upcoming election makes legislative action impractical. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) (plurality opinion). That is the case here. Under a recently enacted Georgia law, qualification for the 2014 state and local elections will take place from March 3–7, with partisan

primaries to select candidates for the general election to follow on May 20. Consequently, the "unwelcome obligation" of creating a redistricting plan for the election of Fayette County Board of Commissioners and Board of Education members falls to the Court. *Perez,* 132 S.Ct. at 940.

## I. Standards for Court–Drawn Remedial Plans

 Ordinarily, redistricting involves "criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment." *Id.* at 941. This is because "experience has shown the difficulty of defining neutral legal principles in this area." *Id.* As a result, a federal court charged with drawing new district lines "should be guided by the legislative policies underlying" a prior plan—including an unenforceable one—"to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Id.* (quoting *Abrams v. Johnson,* 521 U.S. 74, 79, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997)) (internal quotation marks omitted). By doing so the court avoids being drawn into making "otherwise standardless decisions." *Id.*

 In creating a remedial plan to cure a violation of § 2 of the Voting Rights Act, the Court has several obligations. First and foremost, it must "exercise its traditional equitable powers to fashion the relief so that it completely remedies" the § 2 violation and "fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n, Dall. Cnty., Ala.,* 850 F.2d 1433, 1437–38 (11th Cir.1988) (quoting S.Rep. No. 97–417, at 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 208).[1] This means that the Court-created plan must create a majority-minority district.[2] *See Bartlett,* 556 U.S. at 19, 24, 129 S.Ct. 1231.

 Second, the Court-created plan should be narrowly tailored to avoid running afoul of the constitutional right of one person, one vote guaranteed by the Equal Protection Clause of the Fourteenth Amendment. *See DeJulio v. Georgia,* 290 F.3d 1291, 1295 (11th Cir.2002) (explaining when the one person, one vote requirement applies). To do this the plan should strive for a small population deviation—less than 10 percent, the deviation permitted for state or local legislature redistricting purposes. *See Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983).

Third, the Court-created plan cannot violate § 2 or 5 of the Voting Rights Act. *See Dall. Cnty. Comm'n,* 850 F.2d at 1435.

 Fourth, the plan should avoid "intrud[ing] on state policy any more than is necessary" to uphold the requirements of the U.S. Constitution. *Upham v. Seamon,* 456 U.S. 37, 41–42, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (quoting *White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973)). This means that the Court-created plan should follow the tradi-

---

**1.** *See also Dillard v. City of Greensboro,* 74 F.3d 230, 233 (11th Cir.1996); *accord United States v. Brown,* 561 F.3d 420, 435 (5th Cir. 2009); *Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1022 (8th Cir.2006).

**2.** "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population." *Bartlett v. Strickland,* 556 U.S. 1, 13, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion).

tional redistricting principles, though these principles have less precedence than "the requirements of the Constitution and Voting Rights Act." *Larios v. Cox,* 314 F.Supp.2d 1357, 1360 (N.D.Ga.2004) (three-judge court).

## II. Background

Traditionally, Fayette County has used separate districting plans for BOC and BOE elections. Both plans currently divide the county into five districts. Both boards are composed of five members. Both boards are elected on the basis of at-large (county-wide) voting, following partisan primaries. Board members must reside in the district they represent and serve staggered, four-year terms. Board members must be elected with a majority of votes in the general election, and if no candidate receives a majority, the top two vote-getters participate in a run-off.

Plaintiffs [3] challenged the at-large method of electing BOC and BOE members. On May 21, 2013, the Court held that Fayette County's at-large voting scheme violated § 2 of the Voting Rights Act because it gave African–Americans "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" to these boards. *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs (Fayette Cnty. I),* 950 F.Supp.2d 1294, 1326 (N.D.Ga.2013) (quoting 42 U.S.C. § 1973(b)). The Court ordered the parties—Plaintiffs, the School Board Defendants [4] and the County Defen-

dants [5]—to submit proposed remedial plans. Plaintiffs and the County Defendants offered detailed plans with five single-member districts, including one majority-minority district. The School Board Defendants did not offer a plan, but they did reference the February 2012 plan attached to the joint request for a consent decree, approved by the BOE, and precleared by the Department of Justice. They also provided a list of "characteristics" that in their view the May 21 order mandated for any remedial plan and requested that no two BOE incumbents be placed in the same district.

Plaintiffs were ordered to respond to the County Defendants' proposed plan, and after they did, the County Defendants were granted leave to reply to that response. Two issues raised in those responses are relevant here. The first concerns the importance of the traditional redistricting principle of incumbent protection. The second concerns what, if any, deference is owed to the BOC election plan approved in March 2012 and the February 2012 BOE election plan approved by the BOE but never adopted.

## III. Creating the Remedial Plan

To help create a single plan that cures the county's unlawful voting scheme, the Court appointed Gina Wright of the Legislative and Congressional Reapportionment Office of the General Assembly of the State of Georgia as its independent technical advisor. At the Court's direction, Ms. Wright developed a remedial plan for BOC

---

**3.** The Georgia State Conference of the NAACP, the Fayette County Branch of the NAACP, and African–American individuals who are registered voters residing in Fayette County.

**4.** The Fayette County BOE and its members.

**5.** The Fayette County BOC and its members; and the Fayette County Board of Elections and Voter Registration and its department head.

and BOE elections in Fayette County. Specifically, Ms. Wright was directed to develop a single remedial plan that

1. includes one majority-minority district with a "sufficiently large" African–American [6] voting-age population,[7] meaning one that is more than 50 percent;

2. accounts for the traditional redistricting principles of maintaining communities of interest, traditional boundaries, geographical compactness, contiguity, minimizing splits of political subdivisions, and (as explained in Part III.A, *infra*) to a lesser extent protecting incumbents; [8]

3. keeps the population deviation among the districts well below 10 percent; and

4. is drawn so that race is not the predominate factor.

While a copy of the remedial plan is provided in Exhibit A, this chart summarizes its key features and compares them to Plaintiffs' illustrative plan and the County Defendants' proposed plan.

| | Remedial Plan | Illustrative Plan | Proposed Plan |
| --- | --- | --- | --- |
| African–American Voting–Age Population | 50.13% | 50.22% | 50.23% |
| Voting Districts Split | 9 | 14 | 12 |
| Population Deviation | 4.80% | 5.70% | 7–35% |

**6.** In this context, *African–American* is synonymous with the phrase *Black alone or in combination* as used in the 2010 Census data.

**7.** The Eleventh Circuit, like its sister circuits, has held that the focus should be on the voting-age rather than overall population in determining whether the minority population is "sufficiently large" under *Thornburg v. Gingles*, 478 U.S. 30, 50, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *See Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1569 (11th Cir.1997) (agreeing with the Ninth Circuit that "the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population refined by citizenship" (citing *Romero v. City of Pomona*, 883 F.2d 1418, 1424–26 (9th Cir. 1989))); *see also Solomon v. Liberty County, Fla.*, 899 F.2d 1012, 1018 (11th Cir.1990) (en banc) (Kravitch, J., concurring specially and joined by four other judges) (noting that district with an African–American voting-age population of 51 percent would satisfy the first *Gingles* factor, even though African–Americans comprised only 46 percent of registered voters and 49 percent of the total population of that district); *accord Pope v. County of Albany*, 687 F.3d 565, 575–77 (2d Cir.2012) (using a bright-line 50 percent threshold); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir.1999) (same). While *Gingles* establishes the test for § 2 liability, the Eleventh Circuit has recognized that "[t]he inquiries into remedy and liability ... cannot be separated." *Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir.1994) (en banc). Accordingly, the African–American voting-age population is the correct statistic for purposes of determining when the majority-minority district is sufficiently large.

**8.** Because any remedial plan had to split voting districts, Ms. Wright was also asked to be cognizant of the population of the post-split districts to avoid possibly compromising the anonymity of the voters. This request addresses an issue that the County Defendants raised when filing their proposed remedial plan. Their plan left the voting districts of Spring Hill and Blackrock with post-split populations of twenty-five and fifty-three, respectively. The remedial plan, conversely, avoids splitting the Spring Hill district altogether and leaves the Blackrock district with a population of 298.

The remedial plan has a slightly lower African–American voting-age population than the other two plans—50.13 percent versus 50.22 percent and 50.23 percent—but it splits fewer voting districts and has a lower population deviation. It also offers complete incumbent protection, unlike the County Defendants' proposed plan, which leaves two BOE members in the same district, and Plaintiffs' illustrative plan, which places no incumbents in District 5.

Once complete, the Court scheduled a hearing on the remedial plan for February 18, 2014. The parties were to submit any objections to the remedial plan by February 5 and were permitted to respond to the other parties' objections by February 12. On February 5, each party filed a response. While the School Board Defendants and the County Defendants raise issues that have already been decided in order to preserve them for a possible appeal, no party objects to the remedial plan. Each party, however, requests that the Court take some action in addition to adopting the remedial plan. And on February 18 each party appeared before and was heard by the Court.

This Order adopts the plan developed by Ms. Wright as the remedy for Fayette County's § 2 violation and responds to the parties' objections and requests.

### A. A Complete Remedy for the § 2 Violation

 A complete § 2 remedy exists when a minority group "possess[es] the *potential* to elect representatives in the absence of the challenged structure or practice." *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752. Creating a majority-minority district works to completely remedy the § 2 violation because it "enhances the influence" of African–American voters and helps to "ensure[ ] that they are able to elect their candidate of choice." *Voinovich,* 507 U.S. at 154, 113 S.Ct. 1149.

 As a court-imposed remedy, the remedial plan had to include a district where the voting-age population of African–Americans comprise a majority.[9] And that the majority-minority district, like all districts in the remedial plan, had to be drawn consistent with the traditional redistricting principles. *See Fayette Cnty. I,* 950 F.Supp.2d at 1307 (holding that this is the relevant inquiry for § 2 compactness).[10] Accordingly, Ms. Wright was directed to create a plan with one majority-

9. In February 2012 Plaintiffs and the School Board Defendants sought the entry of a consent decree imposing a redistricting plan for BOE elections. After holding a hearing on the appropriateness of the proposed consent plan, the Court denied their request based on the reasoning of the plurality opinion in *Bartlett,* 556 U.S. 1, 129 S.Ct. 1231, the Eleventh Circuit's decision in *Nipper,* 39 F.3d 1494, and the Fifth Circuit's decision in *Fairley v. Hattiesburg, Mississippi,* 584 F.3d 660 (5th Cir.2009). Subsequently, Plaintiffs requested that the Court certify its May 30 order for appeal under 28 U.S.C. § 1292(b). The Court denied this request, holding that there was "no ground for substantial difference of opin-

ion" because "Plaintiffs have failed to present any well-reasoned argument in support of their interpretation of *Bartlett,* to raise any doubt as to the Court's reliance on *Fairley* and *Nipper,* or to identify any other authority that supports their position." [125 at 13]. Importantly, the Court held that "any court-imposed remedy must include a majority-minority district." [*Id.* at 7].

10. As the Supreme Court has explained, § 2 compactness "refers to the compactness of the minority population, not to the compactness of the contested district," which is relevant for challenges under the Equal Protection Clause of the Fourteenth Amendment.

minority district (District 5) in view of the traditional redistricting principles of maintaining communities of interest and traditional boundaries, geographical compactness, contiguity, protecting communities of interest, minimizing splits of political subdivisions, and to a lesser extent protecting incumbents. *See Larios*, 314 F.Supp.2d at 1360, 1362–63 (discussing traditional redistricting principles in Georgia).

■ The remedial plan satisfies these requirements. District 5 has an African–American voting-age population of 50.13 percent. And in creating the remedial plan Ms. Wright gave due consideration to the traditional redistricting principles. Thus, the remedial plan "fully provides equal opportunity for [African–Americans in Fayette County] to participate and to elect" the BOC and BOE members of their choice. *See Dall. Cnty. Comm'n*, 850 F.2d at 1438 (quoting S.REP. No. 97–417, at 31). Section 2 requires nothing more.

### 1. The Importance of Incumbent Protection

■ One major point of contention between the County Defendants and Plaintiffs when they filed their proposed remedial plans and responses concerned the importance of incumbent protection. Incumbent protection is often listed among the traditional districting principles that should guide a court's creation of a redistricting plan. *See, e.g., Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F.Supp.2d 1333, 1345–46 (N.D.Ga.2012). Protecting incumbents has been recognized as a legitimate state in-

terest, and the Georgia General Assembly "has historically followed the principle of avoiding contests between existing incumbents." *Larios*, 314 F.Supp.2d at 1362–63; *see Abrams*, 521 U.S. at 79, 84, 117 S.Ct. 1925 (affirming district-court plan that subordinated incumbency protection to other traditional districting principles); *Vera*, 517 U.S. at 964, 116 S.Ct. 1941 (opinion of O'Connor, J.) (recognizing a legitimate state goal of "avoiding contests between incumbent[s]" (alteration in original)).

Here, the County Defendants urge the Court to adopt a plan that avoids pitting two BOC members against each other. The School Board Defendants also prefer a plan that avoids placing two BOE members in the same district. Indeed, the remedial plans that the School Board Defendants and the County Defendants have either approved or proposed include incumbent protection. Conversely, Plaintiffs encourage the Court to find that incumbent protection is subservient to the other traditional redistricting principles and to recognize the "material advantage that incumbency provides a candidate on Election Day." Accordingly, their illustrative plan places no incumbents in District 5. Further, in their response to the County Defendants' proposed plan, Plaintiffs posit that providing incumbent protection would provide them less than a complete § 2 remedy. In their February 5 filing, however, they note that they "accept the inclusion of a BOC and a BOE incumbent in District 5," but they "maintain that incumbents receive a material advantage on Election Day." They thus ask that "the

---

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (quoting *Bush v. Vera*, 517 U.S. 952, 997, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (Kennedy, J., concurring)) (inter-

nal quotation mark omitted). In other words, the inquiries into compactness for § 2 and equal-protection purposes are distinct. *Fayette Cnty. I*, 950 F.Supp.2d at 1307.

Court order that incumbency not be noted on the ballot for this initial election of District 5." The Court begins by explaining the role that incumbent protection played in creating the remedial plan.

 The consideration of a traditional redistricting principle like incumbent protection is subordinate to the goal of remedying the § 2 violation and the requirements of the Constitution. *Larios,* 314 F.Supp.2d at 1360. Importantly, when incumbent protection has been considered, courts have routinely treated this principle as "a *distinctly subordinate* consideration" to the other traditional redistricting principles. *Id.* at 1362; *see also Abrams,* 521 U.S. 74, 117 S.Ct. 1925, *aff'g Johnson v. Miller,* 922 F.Supp. 1556 (S.D.Ga.1995). That is the approach the Court took here.

At the Court's direction, Ms. Wright created a plan that remedied the § 2 violation; that was consistent with the constitutional mandate of one person, one vote; and that accounted for the traditional districting principles of maintaining communities of interest and traditional boundaries, geographical compactness, contiguity and minimizing splits of political subdivisions. Only then was she asked to consider whether the district lines could be adjusted so that no two BOC or BOE incumbents resided in the same district. She was instructed to make such changes only if doing so would not affect the plan's remedial effect, alter the plan's constitutional commitments, or sacrifice the plan's emphasis on the other traditional redistricting principles. Despite this restrictive criteria, Ms. Wright found that all incumbent BOC and BOE members could be

placed in separate districts through minor changes. It is for this reason that the remedial plan protects incumbents.

In their most recent filings, Plaintiffs appear to have retreated from the position that a complete § 2 remedy requires the creation of open BOC and BOE seats. They are right to do so. It bears repeating that a complete § 2 remedy exists when a minority group "possess[es] the *potential* to elect representatives in the absence of the challenged structure or practice." *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752. Section 2 requires nothing more, and the remedial plan affords African–Americans in Fayette County precisely this opportunity.

Plaintiffs, however, make two additional requests: (1) to extend the qualifying March 3–7 period if necessary to avoid a prohibitively condensed qualification period, and (2) to prohibit the ballots for the initial District 5 BOC and BOE elections from including a notation of incumbency as required by Georgia election law, O.C.G.A. § 21–2–285(c). Both requests are denied.

First, based on the declaration of Tom Sawyer, the Court is satisfied that no delay in the qualifying period is needed. Sawyer indicates that the changes that need to be completed for candidate qualification to proceed as scheduled can be completed in time.[11] If it subsequently appears that this will not be the case, Plaintiffs may request additional relief at that time.

Second, Plaintiffs have not established how removing the incumbency designation from the District 5 ballots is necessary to cure the § 2 violation. Nor do they cite

---

**11.** In their February 5 filing, the County Defendants requested that the Court issue this Order prior to February 25 to ensure that

there was sufficient time to meet the applicable state-law deadlines.

any authority for the proposition that BOC or BOE incumbents receive a material advantage on Election Day. The one case that they do cite, *McGhee v. Granville County, North Carolina,* 860 F.2d 110 (4th Cir.1988), suggests that the Court lacks the authority to remove the incumbent designation from District 5 ballots. The *McGhee* court concluded that the appropriate remedy for a § 2 vote-dilution claim "is to restructure the districting system to eradicate, to the maximum extent possible *by that means,* the dilution proximately caused by that system; it is not to eradicate the dilution by altering other 'electoral laws, practices, and structures' *that were not actually challenged* by the claim as made." *Id.* at 118 (second emphasis added). Plaintiffs raised the incumbent-designation issue for the first time in their February 5 filing; thus, it was not part of the electoral laws, practices, or structures that gave rise to the § 2 violation here. The Court thus declines to override this aspect of Georgia election law.

## 2. The Role of Race in Drawing District 5

The County Defendants admit that their proposed plan was drawn with race as the "primary" consideration. They contend that this is the only way to create a majority-minority district. The School Board Defendants have expressed "renewed concern that [a majority-minority] district can only be produced without sufficient regard to 'traditional districting principles'" and note that the remedial plan divides several voting districts and creates an "island" in the eastern section of district 1 surrounded by District 5.[12] Both concerns center around, and thus the Court will address,

the role of race in creating the remedial plan.

 To be sure, race was *a* factor in creating the remedial plan, specifically the majority-minority district. This should be neither surprising nor contentious. After all, whenever a majority-minority district is intentionally created— whether by a court or a legislature—there is a race-related goal: achieving a minority voting-age population for that district of more than 50 percent. But a plan drawn with an awareness of race or a race-related goal is not per se unconstitutional. This is because "a [plan-creator] may be conscious of the voters' races without using race as a basis for assigning voters to districts." *Shaw v. Hunt (Shaw II),* 517 U.S. 899, 905, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). Nor are plans that intentionally create majority-minority districts automatically subject to strict scrutiny. *Vera,* 517 U.S. at 958, 116 S.Ct. 1941.

 At the same time, redistricting to remedy a § 2 violation is not a license to create racially gerrymandered districts. Classification on the basis of race is constitutionally suspect—"whether or not the reason for the racial classification is benign or the purpose is remedial." *Shaw II,* 517 U.S. at 904–05, 116 S.Ct. 1894. In the context of redistricting, however, "[t]he constitutional wrong occurs when race becomes the 'dominate and controlling' consideration," *id.* at 905, 116 S.Ct. 1894 (quoting *Miller v. Johnson,* 515 U.S. 900, 915–16, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)), or when the "district's shape and demographics" indicate that "traditional race-neutral districting principles, includ-

---

**12.** These same deficiencies, in their view, also attend Plaintiffs' illustrative plan and the

County Defendants' proposed plan.

ing but not limited to compactness, contiguity, and respect for political subdivisions or communities defied by actual shared interests," were subordinated to racial considerations so that "race was *the predominate* factor" in the redistricting process, *Miller,* 515 U.S. at 916, 115 S.Ct. 2475 (emphasis added). The Eleventh Circuit has also explained when strict scrutiny applies:

> [A] court must apply strict scrutiny to predominately race-based redistricting or reapportionment plans. In order to determine whether race is the predominant factor underlying a particular district's design, a court must find that a district-drawer has subordinated traditional race-neutral districting principles (such as geographical compactness, contiguity, and respect for political subdivisions) to race. A court may base such a finding either on circumstantial evidence regarding a district's shape and demographics or on direct evidence of a district-drawer's purpose.

*Davis v. Chiles,* 139 F.3d 1414, 1424 (11th Cir.1998) (internal citations omitted); *see also Fayette Cnty. I,* 950 F.Supp.2d at 1304. In other words, even where race is the predominate factor, a redistricting plan is unconstitutional only if it fails strict-scrutiny review. *Shaw II,* 517 U.S. at 905, 116 S.Ct. 1894; *Miller,* 515 U.S. at 920, 115 S.Ct. 2475.

 Here, race was not the dominate and controlling consideration in creating the remedial plan. Nor were the traditional districting principles subordinated to racial considerations so that race was the *predominate* factor around which the plan revolved. Even District 5—the intentionally created majority-minority district—was drawn in view of the traditional districting principles of maintaining communities of interest and traditional boundaries, geographical compactness, avoiding the splitting of political subdivisions, and contiguity. And while the shape of District 5 is somewhat irregular, this hardly seems surprising given the irregularity of the U.S. Census blocks that comprise it and the goal of creating a majority-minority district. Consequently, neither the circumstantial nor the direct evidence in this case suggests that strict-scrutiny review is appropriate or that District 5 is an impermissible racial gerrymander. *See Vera,* 517 U.S. at 958, 116 S.Ct. 1941 ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. Nor does it apply to all cases of intentional creation of majority-minority districts. Electoral district lines are 'facially race neutral,' so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of 'classifications based explicitly on race.'" (internal citations omitted)).

\* \* \*

 Even if the traditional redistricting principles had been subordinated to race in creating the majority-minority district, the remedial plan would pass constitutional muster. While race-based classifications are subject to strict scrutiny, they will survive this review if they are "narrowly tailored to further a compelling state interest." *Vera,* 517 U.S. at 976, 116 S.Ct. 1941; *see also Miller,* 515 U.S. at 920, 115 S.Ct. 2475.

This Court has already "assumed without deciding that the need to remedy a § 2 violation is a compelling state interest." *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs (Fayette Cnty. II),* 952 F.Supp.2d 1360, 1367 (N.D.Ga.2013). This approach is consistent with that taken

by both the Supreme Court and the Eleventh Circuit. *See, e.g., Shaw II,* 517 U.S. at 915, 116 S.Ct. 1894 ("We assume, *arguendo,* for purpose of resolving this suit, that compliance with § 2 could be a compelling interest...."); *Vera,* 517 U.S. at 977, 116 S.Ct. 1941 (assuming without deciding that "compliance with the results test [of § 2 of the Voting Rights Act], as interpreted by our precedents, can be a compelling state interest" (internal citation omitted)); *Clark v. Putnam County,* 293 F.3d 1261, 1273 (11th Cir.2002) (recognizing that "there is 'a significant state interest in eradicating the effects of past discrimination'" (quoting *Shaw v. Reno (Shaw I),* 509 U.S. 630, 656, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993))); *Davis,* 139 F.3d at 1425 n. 23 ("[A] majority of the Supreme Court has assumed that the need to remedy a Section Two violation itself constitutes a compelling interest."); *Askew v. City of Rome,* 127 F.3d 1355, 1376 (11th Cir.1997) (in dicta) ("[E]liminating violations of Section 2 is a compelling state interest."). Were strict scrutiny to apply here, the Court would hold that remedying a § 2 violation is a compelling state interest. The remedial plan thus survives so long as it is narrowly tailored to remedy the § 2 violation.

▪ Fayette County's at-large voting scheme violates § 2, so any court-ordered plan must include a majority-minority district. In *Vera* the plurality explained that when the "creation of a majority-minority district is reasonably necessary to comply with § 2, and the districting that is based on race 'substantially addresses the § 2 violation,' it satisfies strict scrutiny." 517 U.S. at 977, 116 S.Ct. 1941 (internal citation omitted) (quoting *Shaw II,* 517 U.S. at 918, 116 S.Ct. 1894). Indeed, the plurality rejected the "impossibly stringent ...

view of the narrow tailoring requirement that 'a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria.'" *Id.* (quoting *Vera v. Richards,* 861 F.Supp. 1304, 1343 (S.D.Tex.1994)) (internal quotation marks omitted). Instead, what is required is "[a] § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles." *Id.*

Here, even if the traditional redistricting principles had been subordinated to racial considerations, the Court would find that Ms. Wright did not so subordinate more than was reasonably necessary to remedy the § 2 violation; that by creating a majority-minority district the remedial plan substantially addresses the § 2 violation; and that District 5 is reasonably compact and regular. The Court reached a similar conclusion about Plaintiffs' illustrative plan in the summary-judgment order. At that time, the Court credited the testimony of Plaintiffs' expert that had race been the sole consideration, he could have drawn a majority-minority district with an African–American voting-age population of 53.58 percent, but by considering other districting principles, he created a district with an African–American voting-age population of 50.22 percent. Under these circumstances, the Court found that Plaintiffs' illustrative plan would survive strict scrutiny. *See Fayette Cnty. I,* 950 F.Supp.2d at 1312 & n. 21.

This is no less true for the remedial plan. No attempt has been made to maximize the African–American voting-age population of the majority-minority district; rather, the remedial plan creates an African–American majority district that is slightly smaller than the one in Plaintiffs' illustrative plan (50.13 percent compared to 50.22 percent). Concomitantly, considerable emphasis was placed on keeping the

population deviation of the remedial plan small, a constitutional and thus preeminent consideration. The proof is in the plan. The population deviation of the remedial plan is 4.80 percent. This is a smaller deviation than not only both plans that the parties submitted with a majority-minority district—5.70 percent (Plaintiffs' illustrative plan) and 7.35 percent (the County Defendants' proposed plan)—but also the February 2012 BOE election plan that the School Board Defendants consented to but the Court rejected because it did not create a majority-minority district (5.91 percent).

Other traditional redistricting principles were also plainly considered. For example, great care was taken to avoid splitting voting districts. As a result, the remedial plan splits only nine voting districts—five fewer than Plaintiffs' illustrative plan, three fewer than the County Defendants' proposed plan, and only two more than the March 2012 BOC election plan that did not include a majority-minority district. In short, even if the remedial plan were subject to strict scrutiny, the Court would find that it survives. The evidence is clear that the traditional redistricting principles were not subordinated to racial considerations more than was reasonably necessary to cure the § 2 violation.

### B. The Remedial Plan Is Consistent with the Fourteenth Amendment's One Person, One Vote Requirement

Population deviations can be so extreme that they constitute invidious dis-crimination and thus violate the Equal Protection Clause of the Fourteenth Amendment. Neither side contends that the remedial plan violates the constitutional principle of one person, one vote. Although no bright-line rule has emerged defining when a population deviation violates this requirement, state or local districting plans with a population deviation less than 10 percent belong to the category of minor deviations that are consistent with the constitutional requirements. *See Voinovich,* 507 U.S. at 161, 113 S.Ct. 1149; *Brown,* 462 U.S. at 842–43, 103 S.Ct. 2690. Here, the population deviation of the remedial plan (4.80 percent) falls comfortably below that threshold.[13] Thus, the remedial plan does not rule afoul of the constitutional guarantee of one person, one vote guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

### C. The Remedial Plan Does Not Violate §§ 2 and 5 of the Voting Rights Act

The remedial plan, as explained, supplies a complete remedy to the § 2 violation in this case. It thus plainly comports with § 2. For purposes of § 5, the focus is on ensuring that a remedial plan does not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). Retrogression is not an issue in this case be-

---

**13.** The Supreme Court has held that in two respects judicial-reapportionment plans are subject to stricter standards than legislative-reapportionment plans. These include a strong preference for single-member districts and "the goal of population equality with little more than de minimis variation." *Connor v. Finch,* 431 U.S. 407, 414, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977) (quoting *Chapman v. Mei-er,* 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975)) (internal quotation mark omitted). Although this is a vote-dilution case under § 2 rather than a malapportionment case under the Fourteenth Amendment, considerable emphasis has been placed on keeping the population deviation of the remedial plan small.

cause the remedial plan creates a majority-minority district where none previously existed. *See Larios*, 314 F.Supp.2d at 1366 (evaluating retrogression for § 5 purposes by comparing the number of majority-minority districts across proposed plans).[14]

### D. The Remedial Plan Limits Its Intrusion on County Policy

When they proposed their remedial plan, the County Defendants contended that "[c]ourts are required to defer to legislatively-enacted plans as far as is possible." The current plan for BOC elections was approved in March 2012 and imposed via a consent decree. *Lindsey v. Cnty. Bd. of Comm'rs*, No. 3:12–cv–40–TCB (N.D. Ga. order of Mar. 27, 2012).[15] Normally, redistricting for purposes of BOC elections requires an act of the Georgia General Assembly. Thus, the County Defendants contend that the Court must determine whether it will defer to the court-approved March 2012 BOC election plan.

In their February 5 filing, the School Board Defendants seek to preserve for appeal an argument that the February 2012 BOE election plan that was approved by the BOE and precleared by the DOJ (as *Shelby County* had yet to be decided) and that created a "plurality" African-American district afforded an adequate § 2 remedy. This plan was not enacted by the Georgia General Assembly, nor was it ever judicially approved. *See supra* note 9.

Despite their differences, both the County Defendants' question about deference and the School Board Defendants' renewed emphasis on the adequacy of the February 2012 plan turn on the distinction between legislatively enacted and judicially approved plans.

The answer to these questions begins with the Eleventh Circuit's decision in *Tallahassee Branch of NAACP v. Leon County, Florida*, 827 F.2d 1436 (11th Cir.1987). There, the plaintiffs alleged that the at-large voting system for electing county commissioners violated § 2. To avoid a trial, the defendants sought and received a continuance to place a new election plan, which created four single-member districts and three at-large seats, before the county's voters. In Florida, unlike in Georgia, the county commissioners could create a redistricting plan, but they could not implement it absent a referendum. The voters, however, rejected this plan. The county then admitted liability, and the district court held that the at-large voting scheme violated § 2. At the remedial stage, the defendants proposed a new plan—five commissioners would be elected from single-member districts and two through at-large voting—but instead of submitting this plan to the voters, they presented it to the district court for implementation as the remedial plan. *Id.* at 1437.

Although the county defendants lacked the authority to implement this plan with-

---

**14.** Citing *Shelby County, Alabama v. Holder*, —— U.S. ——, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), the County Defendants suggest that the preclearance and retrogression requirements of § 5 no longer apply to Fayette County. While *Shelby County* undoubtedly quashed the preclearance requirement, the Court explicitly declined to address the constitutionality of § 5. *See id.* at 2631 ("We issue

no holding on § 5 itself, only on the coverage formula [of § 4(b)]."). Thus, § 5 continues to apply to court-drawn redistricting plans as it always has.

**15.** *Lindsey* involved a malapportionment claim under the Equal Protection Clause rather than a § 2 violation.

out voter approval, the district court held that it was "legislatively enacted" and thus "entitled to the deference normally afforded legislative judgment in apportionment matters." *Id.* at 1437–38.

▬ On appeal, the Eleventh Circuit held, over a dissent, that "[t]he district court correctly concluded that the plan at issue was 'legislatively enacted.'" *Id.* at 1440. As the *Leon County* court noted, "a broad definition of 'legislatively enacted' leaves reapportionment to be proved by a legislative body rather than the federal judiciary." *Id.* Additionally, the court reiterated that "the essential characteristic of a legislative plan is the exercise of legislative judgment." *Id.* at 1439 (quoting *McDaniel v. Sanchez,* 452 U.S. 130, 152, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981)).

As the County Defendants admit, *Leon County* has generally not been applied to Georgia counties because redistricting of local governments is undertaken by the Georgia General Assembly rather than the counties themselves. At the same time, federal courts charged with redistricting for purposes of local, Georgia elections have accorded the plans proposed by county defendants some deference as an expression of county policy. *See Smith v. Cobb Cnty. Bd. of Elections & Registrations,* 314 F.Supp.2d 1274, 1290–91 (N.D.Ga.2002) (Carnes, J.) (following Judge Evans's reasoning in *Bodker v. Taylor, CA.,* No. 1:02–cv–999–ODE, 2002 WL 32587312, at *2–4 (N.D.Ga. June 5, 2002), and declining to completely defer to county-proposed plan but noting that such a plan was "still entitled to some consideration as an expression of county policy").

· ▬ The reasoning of *Smith* and *Bodker* is persuasive. Accordingly, the Court has "take[n] guidance" from the expression of county policy in the March 2012 BOC election plan and the February 2012 BOE election plan—even though these plans cannot be judicially imposed because they do not create a majority-minority district—as well as the County Defendants' proposed remedial plan. *See Perry,* 132 S.Ct. at 941. Although this discussion of deference had not yet been made public, the County Defendants note in their February 5 filing that the remedial plan appears to defer to the BOC and BOE "policy decisions to some degree." It does indeed.

▬ To be clear, none of these plans has been legislatively enacted. And there is a difference between taking guidance from an expression of county policy and owing deference to that expression where, as here, a § 2 violation exists. *See Smith,* 314 F.Supp.2d at 1291–93 (explaining that the "minimum change" dictate of *Upham,* 456 U.S. 37, 102 S.Ct. 1518, applies where no constitutional or statutory violation has been found). Indeed, some conflict between the policy preferences in these separate, nonlegislatively enacted plans was inevitable in creating a single remedial plan for BOC and BOE elections. Nevertheless, the remedial plan, which is judicially created rather than legislatively enacted, generally avoids upsetting these policy preferences through the use of the traditional redistricting principles outlined above.

Turning now to the School Board Defendants' renewed interest in the adequacy of the February 2012 BOE election plan, it must be remembered that this plan was to be judicially adopted. Under Georgia law the School Board Defendants have no "legislative judgment" to exercise in the creation of BOE election districts; only the Georgia General Assembly has such au-

thority. Thus, the plan's implementation could not be considered "legislatively enacted" like that of the county defendants in *Leon County*. And as a court-adopted plan, it was therefore subject to "more exacting standards" than a legislatively enacted plan. *Leon County*, 827 F.2d at 1438.

As noted, redistricting is the province of state legislatures, not the federal judiciary. Federal courts are thus permitted to undertake the unwelcome obligation of redistricting only in a limited set of circumstances. And when they must, the quiver of remedial resources from which they draw has far fewer arrows than the one available to state legislatures. So contrary to the School Board Defendants' suggestion, the question is not whether a plurality-minority district like the one in the February 2012 BOE election plan is constitutionally valid or completely complies with § 2. Rather, the question is whether a federal court can create such a district to remedy a § 2 violation. However interesting the first question may be, it is the second question that the Court confronted here. Recognizing that violations of § 2 constitute a "special wrong," *Bartlett*, 556 U.S. at 19, 129 S.Ct. 1231, this Court held that "any *court-imposed remedy* must include a majority-minority district," [125 at 7] (emphasis added). The issue that the School Board Defendants purport to preserve for appeal is thus beyond the scope of the Court's prior ruling.

## IV. Conclusion

Having previously determined that the current districting plans for the election of Fayette County BOC and BOE members violates § 2 of the Voting Rights Act, the County Defendants and School Board Defendants are ENJOINED from qualifying candidates and conducting elections under these unlawful plans.

The Court-created redistricting plan for the election of Fayette County BOC and BOE members (attached hereto as Exhibit A) is ADOPTED as the interim remedial plan for all future Fayette County BOC and BOE elections and shall remain in effect until the General Assembly of Georgia enacts applicable local legislation.

The County Defendants and School Board Defendants shall implement the remedial plan promptly and consistently with the Constitution and laws of the United States and the Constitution and laws of the State of Georgia.

Except as modified by the remedial plan or this Order, all applicable federal, state and local election-related laws remain in effect.

The Clerk is DIRECTED to administratively close this case. The Court, however, shall retain jurisdiction to ensure that the remedial plan is properly implemented and that the parties may seek any further relief that may be necessary.

Exhibit A

**Fayette County Commission and School Board Districts—as drawn by Federal Court–2014**

## Fayette County Commission and School Board Districts- as drawn by Federal Court- 2014

```
FayetteCCSB-FedCt-2014.txt
Plan: FayetteCCSB-FedCt-2014
Plan Type: Local
Administrator: FedCt
User: Gina

District 001
Fayette County
VTD: 11307 - HOPEFUL
140101:
 1009 1010 1011 1012 1013 1014 1015 1016 1017 1018 1019 1042
 1043
VTD: 11309 - RAREOVER
VTD: 11310 - SANDY CREEK
140203:
 1000 1001 1002 1003 1004 1007 1011 1012 1013 1014 1015 1017
 1018 1019 1023 1027 1028 1029 1030 1031 1032 1033 1034 1035
 1047 1066 1067 2000 2001 2002 2005 2009 2010 2011
140204:
 1000 1001 1002 1003 1004 1005 1006 1007 1008 1009 1010 1011
 1012 1013 1014 1015 1016 1017 1018 1019 1020 1021 1023 1024
 2002 2005 2006 2007 2008 2009 2010 2011 2012 2013 2014 2015
 2016 2017 2018 2019 2020 2021 2026 2027 2028 2029 2033 2034
 3002 3003 3011
VTD: 11311 SHAKERAG EAST
VTD: 11316 - MCINTOSH
VTD: 11319 - ABERDEEN
140206:
 2020 2021 2022 2023 2025
140207:
 2001 2002 2003 2004 2009 2010
VTD: 11326 - WILLOW POND
VTD: 11327 - DOGWOOD

District 002
Fayette County
VTD: 11302 - BROOKS
VTD: 11313 - STARRSMILL
VTD: 11314 WHITEWATER
140305:
 1065 1066 1068 1069 1070 1071
140307:
 1003 2000 2001 2003 2004 2005 2010 2011 2012 2013 2014 2015
 2016 2017 2018 2019 2020
140404:
 2045 2064
140405:
 1000 1001 1002 1003 1004 1005 1006 1007 1012 1013 1014 1015
 1016 1017 1018
VTD: 11315 - WOOLSEY
VTD: 11317 - OAK GROVE
VTD: 11322 - BRAELINN
VTD: 11334 - RISING STAR

District 003
Fayette County
VTD: 11312 - SHAKERAG WEST
VTD: 11314 WHITEWATER
140304:
 3013 3019 3020 3021 3023 3025 3062
 Page 1
```

FayetteCCSB-FedCt-2014.txt

```
140303:
 1067
VTD: 11318 - KEDRON
VTD: 11319 - ABERDEEN
140207:
 2005 2006 2007 2008 2011 2012 2013 2014 2015 2016 2017 3023
 3024 3027 3028 3029 3030 3034 3036
140208:
 3016 3017 3018 3024 3027 3028 3029 3030 3031 3032 3033 3034
 3038 3039
VTD: 11320 - WINDGATE
VTD: 11321 - FLAT CREEK
VTD: 11331 FIELDING RIDGE
VTD: 11332 - WILLOWBEND
VTD: 11333 - CAMP CREEK

District 004
Fayette County
VTD: 11301 - BLACKROCK
140403:
 3013 3018 3032 3033 3034 3035 3038 3039 3040 3042 3043 3044
 3045
VTD: 11304 - FAYETTEVILLE EAST
140406:
 1014 1021 2003 2004 2005 2006 2007 2008 2009 2011 2012 2013
 2024
VTD: 11305 - FAYETTEVILLE WEST
VTD: 11306 - FLINT
VTD: 11308 - MORNING CREEK
140102:
 2046 2047 2050 2051 2053 2056 2057 2058 2059 2060 3015 3016
 3025 3026
140403:
 1001 1003 1004 1005 1006
140404:
 1013 1014 1015 1016 1017 1018 1027 1028 1029 1030 1036 1045
 1046
VTD: 11324 - BANKS
VTD: 11325 HARPS CROSSING
VTD: 11328 - OAK RIDGE
140101:
 3040 3042
140102:
 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019
 2020 2023 2045 3000 3001 3002 3003 3004 3008 3009 3010 3013
 3014
VTD: 11329 - JEFF DAVIS
140405:
 2000 2001 2002 2003 2004 2005 2021
140406:
 1022 1024 1025 1029 1030
140407:
 2000 2001 2002 2003 2004 2005 2006 2007 2041 3000 3001 3002
 3003 3004 3005 3006 3007 3008 3009 3010 3012 3013 3014 3016
 3017
VTD: 11330 MURPHY
VTD: 11335 - SPRING HILL
VTD: 11336 - ANTIOCH

District 005
Fayette County
```

```
 FayetteCCSB-redct-2014.txt
VTD: 11301 - BLACKROCK
140403:
 3005 3006 3007 3008 3009 3010 3011 3012 3014 3015 3016 3017
 3019 3020 3021 3022 3023 3024 3025 3026 3027 3028 3029 3030
 3031 3036 3037 3041
VTD: 11303 - EUROPE
VTD: 11304 - FAYETTEVILLE EAST
140406:
 1015 1016 1017 1018 1019 1020 1023 1032 2014 2015 2016 2017
 2018 2019 2020 2021 2022 2023
VTD: 11307 - HOPEFUL
140101:
 1005 1006 1007 1008 1020 1021 1022 1028 1029 1030 1038 1039
 1040 1041 1045 2000 2001 2002 2003 2004 2005 2006 2007 2008
 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019
VTD: 11308 - MORNING CREEK
140102:
 3007 3011 3012 3017 3018 3019 3020 3021 3022 3023 3024
140403:
 1000 1002 2000 2001 2002 3000 3001 3002 3003 3004
VTD: 11310 - SANDY CREEK
140203:
 1005 1006 1008 1009 1010 1016 1020 1021 1022 1024 1025 1026
 1048 1049 1050 1051 1052 2003 2004 2006 2014 2015
140204:
 1022 1025 1026 1027 1028 1029 1030 1031 2000 2001 2003 2004
 2030 2031 2032 2035 2036 2046 3000 3001
VTD: 11323 - KENWOOD
VTD: 11328 - OAK RIDGE
140102:
 1000 1001 1002 1003 1004 1005 1006 1007 1008 1009 1010 1011
 3005 3006
VTD: 11329 - JEFF DAVIS
140407:
 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019
 2020 2021 2022 2023 2024 2025 2026 2027 2028 2029 2030 2031
 2032 2033 2034 2035 2036 2037 2038 2039 2040
```

Page 3